FILED
02/03/2025
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 9, 2025 Session

**BRENDAN TODD NEGRON v. ANDREW NICHOLAS ROACH**

**Appeal from the Circuit Court for Davidson County**
**No. 24X22    Dana Ballinger, Special Master**
_____

**No. M2024-00299-COA-R3-CV**
_____

Petitioner's ex-wife became romantically involved with the Respondent. The Petitioner sought an order of protection for himself and his children against the Respondent, asserting that the Respondent stalked him and his children. The Respondent opposed the petition, asserting that he had only ever been near the Petitioner for the legitimate purpose of protecting Petitioner's ex-wife and children from Petitioner, who has a troubling history of violence and who allegedly continued to emotionally harm the children during their online visitation. The General Sessions Court concluded that the Petitioner failed to prove stalking and declined to grant an order of protection. Petitioner advanced the petition to Circuit Court. The Circuit Court also refused to grant an order of protection and found that the Petitioner made knowingly false allegations at the time of filing his order of protection petition. Accordingly, the Circuit Court awarded attorney's fees and costs to the Respondent. The Petitioner appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Brendan Todd Negron, Hermitage, Tennessee, pro se.

Jonathan H. Wardle, Lebanon, Tennessee, for the appellee, Andrew Nicholas Roach.

**OPINION**

**I.**

In 2023, Appellant Brendan Negron sought an order of protection against Appellee

Andrew Roach based on allegations of stalking. The Davidson County General Sessions Court dismissed Mr. Negron's petition. Mr. Negron continued to pursue an order of protection against Mr. Roach by taking his case before the Davidson County Circuit Court, which similarly refused to issue such an order. Having found that Mr. Negron knowingly submitted false allegations at the time of filing his petition for an order of protection, the Circuit Court also ordered Mr. Negron to pay Mr. Roach's attorney's fees and costs. Mr. Negron appeals both the failure to award an order of protection and the award of attorney's fees and costs.

Turning to the underlying circumstances giving rise to this action, Mr. Negron was previously married to Kelsi Walters. They had three children together. According to Mr. Negron, the marriage began to decline after he allegedly discovered a "love letter" in Ms. Walters' possession that had been sent to her by Mr. Roach. Mr. Negron and Ms. Walters subsequently divorced.

Mr. Negron and Ms. Walters became immersed in a custody dispute in which Mr. Negron did not receive the custody that he was seeking. That outcome appears to be owed, at least in part, to an assault that occurred during the pendency of the custody dispute. Mr. Negron was convicted of aggravated domestic assault in connection with an incident in which he hit Ms. Walters with a bar stool and locked himself and his children inside of the house while claiming to have a gun. Mr. Negron refused to come out of the house even after being directed to do so by police, resulting in the calling of a SWAT team. Eventually, Mr. Negron surrendered to the police at gunpoint.

Ms. Walters moved into Mr. Roach's home with the three children, and Mr. Roach and Ms. Walters became engaged to marry. Meanwhile, a jury convicted Mr. Negron of aggravated domestic assault, and he received a sentence of five years probation. Ms. Walters obtained custody of the children. Mr. Negron's visitation with the children was sharply limited by the court, but Mr. Negron did, for a time, exercise supervised in-person visitation with his children at a Murfreesboro facility known as the Kymari House. These in-person visits were stopped, however, by court order, and Mr. Negron's visitation was transitioned to virtual sessions with the children on Zoom. During his Zoom calls with his children, Mr. Negron allegedly engaged in problematic behavior including speaking with his children during his online sessions while gambling in a bar in violation of the conditions of his probation and showing the children pictures of bruises on their mother related to the domestic assault conviction. Mr. Negron also evidently engaged in other problematic actions. For example, Mr. Roach claims that Mr. Negron, without basis, made a call to law enforcement to indicate that he had concerns about the safety of the children, resulting in law enforcement's entering the home that Mr. Roach shares with Ms. Walters and stirring the children at 11:00 at night.

The genesis of this appeal, however, is Mr. Negron seeking an order of protection against Mr. Roach. In the section labeled "Describe Abuse," the petition reads,

Andrew Roach has be[en] stalking me & my children for at least 3 years. He follows me when I have visitation & when I do not. He has made threatening gestures towards me and my family. I fear he will harm me, my children, & our animals. I have witnessed him follow me on June 1st, August 3rd, December 7th, & suspected him [to have been] following me on other dates. He has damaged my property & has trespassed on my property.

The stalking started in 2020, but the first confirmed recording was in 2023.

Andrew has access to firearms & has used his body to damage my car & has slashed my tires.

Andrew has made threats to slit my throat & that he is watching me via gestures. He comes around me while I am with my children. He follows me in his car to places & stay[s] outside until I leave & then leaves to follow me again & to my home.

Before the parties' hearing in the Davidson General Sessions Court, Mr. Negron filed a motion seeking to have attorney Eric Phillips of Hagar & Phillips, whom Mr. Roach had hired to represent him in the order of protection action, disqualified from doing so. Prior to this litigation, Mr. Negron paid Hagar & Phillips, PLLC, one-hundred dollars in connection with a legal consultation. The record contains a copy of the firm's letterhead and that letterhead indicates that only two attorneys worked at the firm when Mr. Negron sought assistance: Tiffany D. Hagar and Eric L. Phillips. The record contains no documentation suggesting that Hagar & Phillips, PLLC, took any action in a representative capacity on Mr. Negron's behalf during his custody dispute or criminal proceedings. Mr. Negron expressed concern that Mr. Phillips had access to sensitive materials related to his consultation with Hagar & Phillips that, he believed, gave Mr. Roach an unfair advantage in the litigation. Mr. Phillips disputed such assertions. He insisted that there was nothing ethically improper about his representation of Mr. Roach and indicated that he had an ethics opinion in support thereof. Evidently, the Davidson County General Sessions Court agreed because it declined to disqualify Mr. Phillips from continuing to represent Mr. Roach.

Regarding the underlying merits of Mr. Negron's petition, the Davidson County General Sessions Court conducted a hearing on Mr. Negron's petition for an order of protection. After considering the evidence presented, the General Sessions Court denied Mr. Negron's petition. The judgment form sets forth the court's finding that Mr. Negron "did not prove the evidence in the Petition by a preponderance of the evidence."

Mr. Negron continued to pursue the order of protection, advancing the case to the Davidson County Circuit Court. For the first time, he obtained counsel for litigating this matter. Mr. Negron's counsel did not renew Mr. Negron's motion seeking the

- 3 -

disqualification of Mr. Phillips in the Circuit Court, nor does the record contain any indication that disqualification was sought in the Circuit Court.

As to the merits of Mr. Negron's petition for a protective order, a hearing was conducted before the Circuit Court. Four witnesses testified, starting with Mr. Negron. Mr. Negron indicated that there were approximately fourteen incidents in which Mr. Roach had stalked him in-person and he also expressed concern about Mr. Roach observing recordings of his zoom calls with the children. Mr. Negron testified that he believed Mr. Roach drives a gray Mazda SUV and that he recalled witnessing such a gray Mazda SUV near him on several occasions. Mr. Negron asserted he saw such a gray Mazda SUV outside of his home one day. According to Mr. Negron, he noticed significant damages to his personal vehicle the next day, including "a dent in the frame . . . an extended crack on my windshield . . . [and] damage to my tire." Mr. Negron accused Mr. Roach of damaging his vehicle but did not indicate that he had seen him do so. Mr. Negron testified that he observed the same gray Mazda SUV parked near the house of his then-girlfriend, Alexis Carr, on at least one occasion. Mr. Negron asserted that this gray Mazda SUV turned around in Ms. Carr's driveway at one point and in his personal driveway at another point. Mr. Negron also asserted that Mr. Roach attempted to corner him using his gray Mazda SUV following a court hearing. Mr. Negron also identified several instances of Mr. Roach attending court hearings that, in his view, did not concern Mr. Roach. These hearings involved issues related to Mr. Negron and Ms. Walters' custody rights and Mr. Negron's criminal sentencing in relation to the aggravated domestic assault conviction. Mr. Negron testified further that, at one of these court hearings, Mr. Roach made a throat-slitting gesture directed at Mr. Negron from across the courtroom. Mr. Negron opined that Mr. Roach's conduct, which he believed amounted to stalking, caused him to lose sleep, gain weight, and experience feelings of anxiety and fear. Mr. Negron also asserted that his children were injured while under Mr. Roach's supervision. Furthermore, Mr. Negron also testified that his ex-wife owned weapons and that, by virtue of living together, Mr. Roach had access to those same firearms.

Mr. Negron's girlfriend, Ms. Carr, also testified. She also indicated that Mr. Roach drives a gray Mazda SUV, that Mr. Negron's car was damaged, and that Mr. Roach made a throat-slitting gesture directed at Mr. Negron during a court hearing. She also testified that she once saw Mr. Roach and Ms. Walters at a nearby Goodwill after dropping Mr. Negron off for his supervised visitation at the Kymari House.

Mr. Roach's observation of Mr. Negron at Ms. Carr's residence was, apparently, the subject of testimony in another legal proceeding that involved Ms. Carr's custody of her child. Ms. Carr had been ordered to not allow Mr. Negron, who the court concluded constituted a danger given his aggravated domestic assault conviction, around Ms. Carr's child. In part, based upon testimony from Mr. Roach, a court determined that Ms. Carr had failed to adhere to this court order, finding her in contempt and resulting in a custody change.

- 4 -

Officer Billy Burns of the Wilson County Sheriff's Department Court Division testified about his interactions with Mr. Negron and Mr. Roach on the afternoon that Mr. Negron alleged that Mr. Roach followed him after leaving the courthouse and cornered him with his vehicle. Officer Burns indicated that he was called to a trial courtroom by one of the other officers. Mr. Negron had been "acting up a little bit" and caught the attention of the trial court judge who was expressing frustration with Mr. Negron. Officer Burns eventually escorted Mr. Negron out of the courthouse. About ten minutes later, Officer Burns escorted Mr. Roach to his vehicle upon request of counsel. Unlike with Mr. Negron, Officer Burns indicated that "everything seemed to be okay" with Mr. Roach.

Finally, Mr. Roach testified. Mr. Roach conceded that he had intentionally been near Mr. Negron on more than one occasion. According to him, "it was important to establish a behavioral pattern" for Mr. Negron, given his violent past conduct directed at Ms. Walters and the children and the parties' litigation disputes. To that end, Mr. Roach testified that he was near Mr. Negron's girlfriend's home on one occasion, that he went to a bar that Mr. Negron frequents on one occasion, and that he was near Mr. Negron's home on another occasion. He also indicated that he had been near Mr. Negron at a series of court hearings concerning Ms. Walters' custody dispute and Mr. Negron's criminal sentencing. Outside of these instances, Mr. Roach disagreed with Mr. Negron's recollections. Mr. Roach denied ever damaging Mr. Negron's vehicle or making any threatening gesture at him. Mr. Roach also denied being at Goodwill on the occasion that Ms. Carr claimed, presenting the court with a copy of his work schedule that indicated he was supposed to be working in his capacity as a health professional at that exact time. Regarding Mr. Negron's allegations about child injuries, Mr. Roach denied engaging in any harmful or abusive conduct with Mr. Negron's children. He explained that any bruising or injuries that the children suffered occurred while he was out of town in one instance or due to a child running into a table while playing indoors in another instance. Mr. Roach also opined, given his status, education, and experiences as a medical professional, that Mr. Negron displays "sociopathic behavior" and that this behavior made him reasonably concerned about the safety of Ms. Walters and the children. Mr. Roach emphasized that he never intended to intimidate or harass Mr. Negron, but that he instead was focused on "picking places [Mr. Negron] was not supposed to be to see if he was there" to better understand whether Mr. Negron was trying to get near or harass Ms. Walters and the children. One example of what Mr. Roach considered to be a place where Mr. Negron "was not supposed to be" was a bar wherein Mr. Negron could possibly have been conducting some of his Zoom visitation calls while allegedly drinking and gambling. In Mr. Roach's view, it would have been entirely inappropriate for Mr. Negron to be exposing the children to alcohol and gambling during Zoom visitation, which prompted Mr. Roach to visit the bar to see if Mr. Negron was present on one occasion.

Mr. Roach recalled a roadside encounter between himself and Mr. Negron, suggesting improper motives from Mr. Negron. According to him, one afternoon, while

training for a triathlon,

> I was out in the back roads of Wilson County when a car pulled up next to me. It was a silver sedan. It was not a car that I recognized. And the window on the passenger side rolled down. I was stopped at that time. I was drinking some water and taking an energy gel, and there was a voice that came from inside the car and said, "Hey." And I looked down in the car and who was there, Mr. Negron. So I stood there for a minute and I'm like, wow, okay, so this is the next level.

Mr. Roach stated that Mr. Negron referenced an email containing "an innuendo that I was touching the children inappropriately." Mr. Roach testified, "Mr. Negron indicated to me – and I'm sort of paraphrasing here – that this particular email would not go any further if I were to send him $5,000."

Having emphatically denied any allegation that he had inappropriately touched any of the children and testifying that he declined to give Mr. Negron any money, Mr. Roach continued:

> I thought, well, maybe that's the end. But lo and behold, it was not the end.

> On or about October 24th . . . I was sitting at home on my couch and my son approached me and he asked me a question. He showed me his phone. He said, "Dad, isn't Brendan Negron the guy that's been giving you trouble?"

> And I said, "Yeah, why are you asking?"

> And my son showed me . . . his phone screen where Mr. Negron was attempting to contact him via one of the money paying apps. And I'm blanking on this one at the moment, because, once again, I'm very angry. It's not Zelle. It's Venmo. Mr. Negron was attempting to contact my son via a money paying app. My son asked me what he should do. I told him to ignore it.

Mr. Roach classified these instances as being part of "a pattern of harassment," and reasoned that those incidents raised concerns about Mr. Negron's behavior.

Before Mr. Roach could call a witness of his own, the Circuit Court decided to end testimony and issue an oral ruling, which it substantially mirrored in a later-written order. In its written order, the Circuit Court made the following findings of fact and conclusions of law:

1. Petitioner's *Order of Protection* is dismissed on the merits with prejudice.
2. That Andrew Roach's behavior was reasonable and supported by legitimate purpose given the circumstances and prior conduct of Mr. Negron.
3. That Mr. Negron's knowingly false accusations towards Mr. Roach regarding abuse of the children were egregious to the Court.
4. That Mr. Negron's conduct towards Mr. Roach was nothing short of extortion.
5. By clear and convincing evidence, Mr. Negron knew that he had no basis on which to file a *Petition for Order of Protection*.
6. By clear and convincing evidence, the award of attorney's fees in favor of the Respondent was proper under Tenn. Code Ann. § 36-3-617(2)(B) given the knowingly false allegations made against the Respondent by Petitioner at the time of filing the petition.
7. That Petitioner shall be responsible for Respondent's attorney fees and costs in the amount of $11,688.91 for which a judgment shall be entered, and execution shall issue, if necessary. Payments shall be paid directly to Respondent, Andrew Roach.

Regarding the "legitimate purpose" finding, the Circuit Court stated during its oral ruling that

> it is not unreasonable for Mr. Roach to want to – all the places that he was, all the places that he was spotted, that it was reasonable for him to want to establish whether or not Mr. Negron was gambling, or he was doing this from a Zoom call, or to attend court hearings. They all attended court hearings in which they were not a party. We are able to do that. There's nothing that says we can't do that. And, in particular, it's not for no reason. It is because they're very much involved in ongoing litigation. The children are young and it looks like this is going to go on for a very long time, and each party is trying to build his or her case. And in doing that, if you suspect someone is operating Zoom calls from a bar, you may go and see; or if he's gambling, and that's been a problem with the Court. If someone was drinking while driving and the spouse wanted to see if they caught them doing that, all of this is permissible because you have to prove your case in court.
>
> . . .
>
> In this case the Court finds that there is a legitimate purpose for being at the locations that Mr. Roach was on all of these occasions during which he's accused of stalking Mr. Negron.
>
> The concern is the children, at a higher level.

. . .

I find no basis for the issuance of an Order of Protection. I find no stalking, which, again, is defined as more than one noncontiguous incident or behavior which had no legitimate purpose, and all the behavior complained of had legitimate purpose.

Mr. Negron appealed. On appeal, he asserts four errors: (1) error with regard to the admission of certain evidence, (2) error by allowing Mr. Phillips to represent Mr. Roach, (3) error in failing to conclude that Mr. Roach's conduct qualifies as stalking, and (4) error in ordering Mr. Negron to pay attorney's fees and costs on the basis that he made knowingly false allegations at the time of filing his petition. Mr. Roach defends the trial court's decision-making on appeal, and he separately requests his attorney's fees associated with defending the Circuit Court's order in this court.

II.

We note that on appeal before this court, Mr. Negron is a pro se party. Pro se litigants "are entitled to fair and equal treatment by the courts." *Vandergriff v. ParkRidge E. Hosp.*, 482 S.W.3d 545, 551 (Tenn. Ct. App. 2015). Courts should be mindful that pro se litigants often lack any legal training and many are unfamiliar with the justice system. *State v. Sprunger*, 458 S.W.3d 482, 491 (Tenn. 2015). Accordingly, courts should afford some degree of leeway in considering the briefing from a pro se litigant, *Young v. Barrow*, 130 S.W.3d 59, 63 (Tenn. Ct. App. 2003), and should consider the substance of the pro se litigant's filing. *Poursaied v. Tennessee Bd. of Nursing*, 643 S.W.3d 157, 165 (Tenn. Ct. App. 2021).

Pro se litigants, however, may not "shift the burden of litigating their case to the courts." *Whitaker v. Whirlpool Corp.*, 32 S.W.3d 222, 227 (Tenn. Ct. App. 2000). Additionally, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010). It is imperative that courts remain "mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary." *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003).

III.

Tennessee appellate courts "review the trial court's findings of fact after a bench trial 'de novo upon the record with a presumption of correctness, 'unless the preponderance of the evidence is otherwise.'" *Mathes v. 99 Hermitage, LLC*, 696 S.W.3d 542, 552 (Tenn. 2024) (quoting *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017) (quoting Tenn. R. App. P. 13(d))). The trial court's conclusions of law, however, are reviewed de novo with no presumption of correctness. *Hughes v. Metro. Gov't of Nashville & Davidson*

- 8 -

*Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011).

<center>IV.</center>

Mr. Negron asserts the trial court erroneously admitted evidence that distorted the proper outcome of this case. Regarding his evidentiary arguments, there are some discrepancies in Mr. Negron's briefing that make it difficult to fully apprehend his objection. Mr. Negron in his issue statement indicates that he believes erroneous evidentiary rulings were made concerning "Federal Rule of Evidence 403," but his accompanying substantive argument section references both "Rule 403" and "Rule 404." While the Federal Rules of Evidence do not apply in Tennessee courts, Tennessee's Rules of Evidence mirror the organization of the federal rules in this context. Each state-level counterpart to the two rules mentioned in Mr. Negron's brief addresses different types of evidence and provides different reasons for excluding testimony, and Mr. Negron does not fully explain which rule he believes applies to which specific, admitted testimony. *Compare* Tenn. R. Evid. 403 (allowing trial courts to exclude evidence that presents a "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence") *with* Tenn. R. Evid. 404 (allowing trial courts to exclude evidence of character generally as well as specific instances of crimes, wrongs, or other acts).

Additionally, neither of these evidentiary rules were invoked at any point before the Circuit Court as a basis of objection regarding the evidence as to which Mr. Negron expresses concern about on appeal. In fact, as Mr. Roach correctly observes in his appellee's brief, "Mr. Negron's attorney only objected four times . . . and not once did Mr. Negron's attorney state that his objection was based on Rules of Evidence 403 or 404." "Generally, failure to make a timely, specific objection in a trial court prevents a litigant from challenging the introduction of inadmissible evidence for the first time on appeal." *Welch v. Bd. of Pro. Resp. for the Supreme Ct. of Tenn.*, 193 S.W.3d 457, 464 (Tenn. 2006); *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 196 (Tenn. Ct. App. 2008) ("Parties challenging the admissibility of evidence are generally not permitted to raise the issue on appeal when the record does not show that a timely objection was made and the specific basis for that objection.").

While Mr. Negron mentions certain admitted evidence that he finds objectionable in his appellate brief, including testimony about child support and gambling, there are simply no corresponding timely and specific objections before the Circuit Court on the bases now advanced on appeal. Mr. Negron did not invoke either Tennessee Rule of Evidence 403 or 404 as a basis of objection to this evidence before the Circuit Court. Additionally, Mr. Negron has failed to posit any explanation for the why the general rule that failure to raise a timely and specific objection precludes his objecting on appeal is inapplicable in the present case. Accordingly, Mr. Negron waived his evidentiary objections which are being advanced for the first time on appeal.

## V.

Mr. Negron's argument related to disqualification of Mr. Phillips, Mr. Roach's counsel, suffers from problems in the same vein. After failing in his attempt to disqualify Mr. Phillips before the General Sessions Court, it does not appear from the record that Mr. Negron sought to disqualify Mr. Phillips in the Circuit Court. At a minimum, Mr. Negron has not directed this court on appeal to where such a motion was brought before the Circuit Court. It is well-established that appeals from general sessions courts to circuit courts are conducted de novo. *See, e.g., Ware v. Meharry Med. College*, 898 S.W.2d 181, 184-86 (Tenn. 1995) (explaining the history of general sessions courts and circuit court review of general sessions court decisions); *Hohenberg Bros. Co. v. Missouri Pac. R. Co.*, 586 S.W.2d 117, 119 (Tenn. Ct. App. 1979). This means that "the Circuit Judge does not review the action of the General Sessions Judge and is not concerned with what took place in the General Sessions Court nor the propriety of the lower Court's action . . . . The matter is Tried as if no other trial had occurred." *Hohenberg Bros. Co.*, 586 S.W.2d at 119; *see also Ware*, 898 S.W.2d at 184 (noting that circuit court appellate jurisdiction "provide[s] the parties an entirely new trial"). Insofar as Mr. Negron asserts that the Circuit Court erred in allowing Mr. Phillips to represent Mr. Roach, Mr. Negron's failure to renew his motion guaranteed that outcome. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Because Mr. Negron failed to properly preserve and present his disqualification contention to the Circuit Court, the issue is waived.

## VI.

The central focus of Mr. Negron's appeal is his disagreement with the Circuit Court's substantive ruling on the issue of whether Mr. Roach stalked him. According to Mr. Negron, the testimony before the trial court demonstrates that Mr. Roach's conduct satisfies each element of stalking, and the Circuit Court erred in holding otherwise. Mr. Negron asserts that the Circuit Court's finding that Mr. Roach's conduct served a legitimate purpose is fundamentally flawed. He insists that the trial court's decision essentially legitimizes the exact conduct prohibited by the statute. In his view, Mr. Roach's admission that he was attempting to ascertain Mr. Negron's "behavioral pattern" by seeking him out in public places where he, in Mr. Roach's view, "was not supposed to be" is tantamount to stalking.

Mr. Roach disagrees. He asserts the testimony did not establish that he engaged in stalking, and that, even if Mr. Negron presented some evidence that might suggest stalking, the Circuit Court's finding that he acted with a "legitimate purpose" fatally undermines Mr. Negron's petition. Mr. Roach insists that under the circumstances he acted reasonably and with a legitimate purpose of protecting Ms. Walters and the children from Mr. Negron.

- 10 -

Therefore, Mr. Roach argues the Circuit Court properly found that he did not engage in stalking.

Mr. Negron based his request for an order of protection on an allegation that he was a "stalking victim." *See* Tenn. Code Ann. § 36-3-601(12). That term is defined by statute as "any person, regardless of the relationship with the perpetrator, who has been subjected to, threatened with, or placed in fear of the offense of stalking, as defined in [Tennessee Code Annotated] § 39-17-315." *Id.* According to the referenced statute, "'[s]talking' means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Tenn. Code Ann. § 39-17-315(a)(4), (b)(2) (effective July 1, 2023, to Jun. 30, 2024). Under Tennessee's stalking statutory scheme,

> (3) "Harassment" means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.

Tenn. Code Ann. § 39-17-315(a)(3) (effective July 1, 2023, to Jun. 30, 2024). In accordance with the plain text of the statute, "that a defendant is engaged in constitutionally protected conduct or conduct that serves a legitimate purpose is not merely an affirmative defense; such conduct falls instead outside the scope of the definition of stalking." *Long v. City of Clarksville*, No. 3:22-cv-00267, 2022 WL 17875858, at *8 (W.D. Tenn. Dec. 22, 2022) (citing *Purifoy v. Mafa*, 556 S.W.3d 170, 191 (Tenn. Ct. App. 2017)).

In its order, the Circuit Court directly stated its finding that Mr. Roach's "behavior was reasonable and supported by a legitimate purpose given the circumstances and prior conduct of Mr. Negron." With the question of whether Mr. Roach engaged in stalking as the central issue in this appeal, it is the sub-issue of whether Mr. Roach's conduct served a legitimate purpose that becomes the fulcrum upon which the answer to that question turns.

The statutory scheme for stalking in Tennessee does not provide a definition for "legitimate purpose." This language, however, has been considered in a number of decisions by Tennessee courts, including, notably, in *State v. Goldberg*, No. M2017-02215-CCA-R3-CD, 2019 WL 1304109 (Tenn. Crim. App. Mar. 20, 2019) and *State v. Thomas*, No. E2018-00353-CCA-R3-CD, 2019 WL 3822178 (Tenn. Crim. App. Aug. 15, 2019). In *Goldberg*, a property dispute between two neighbors escalated to threatening and harassing behavior by one neighbor against another. *Goldberg*, 2019 WL 1304109, at *1. The victimized neighbor was particularly vulnerable through impairment as a result of

multiple sclerosis and lupus. *Id.* The threats from the defendant went so far as to include threats to shoot the victim with a gun. *Id.* The defendant also poisoned the victim's plants and trees. *Id.* In challenging a stalking conviction on appeal, the defendant argued that the purported stalking conduct had been for a legitimate purpose, but the Tennessee Court of Criminal Appeals rejected that contention. *Id.* at *15, 17. The *Goldberg* Court stated:

> Contrary to her assertions, the Defendant did not merely engage in activities with a legitimate purpose such as parking on the street, attending a residents' meeting, and eating at the golf club. Instead, the evidence . . . shows that the Defendant stopped her vehicle in front of the victim's home and stayed in the vehicle for thirty minutes while staring menacingly at the victim, occasionally inching the vehicle forward, and taking photographs. She followed the victim out of a meeting and stood near her and glared, although the Defendant's own car was not parked in the vicinity. She also growled at the victim at the golf club. We conclude that a rational trier of fact could have found that these activities served no legitimate purpose but were calculated to harass, intimidate, and terrorize the victim.

*Id.* at *17.

State v. Thomas involved a dispute between two families in which the defendant's primary animus became directed at a minor child. *Thomas*, 2019 WL 3822178, at *1. The defendant made a wide variety of threats against the minor child and her family members, ranging from threats of physical violence to threatening to spread false rumors that the minor child had been raped by her siblings. *Id.* at *1-3. The minor victim was followed by the defendant and denounced directly face-to-face as a whore, informed as to a litany of all of the people who hated her, and threatened with having her life ruined. *Id.* at *2. A protective order was issued against the defendant, but the defendant violated it. *Id.* The defendant's daughter and the victim attended the same school. *Id.* at *1. Despite being ordered to stay away from the victim, the defendant repeatedly pulled her vehicle directly in front of the location near the school where the victim's mother parked to pick up the victim from school, a spot that the victim had to walk by to reach her mother's car. *Id.* at *2-3. While the victim was walking by, the defendant would give "dirty looks" that made the victim feel uncomfortable. *Id.* at *2. The defendant was advised by the school of alternative sites for pick up and informed by a law enforcement officer that she could not park in front of the victim's mother but the defendant, nevertheless, persisted. *Id.* at *3-4. The defendant argued that her conduct served the legitimate purpose of picking her daughter up from school and, thus, did not qualify as stalking. *Id.* at *14. The State countered that "the evidence demonstrates that, while the [D]efendant perhaps had a legitimate purpose for being in the general area of the school, this purpose did not extend to the specific area she chose to occupy daily near the victim." *Id.* The State added that "a reasonable trier of fact could conclude that the [D]efendant's conduct in parking behind the victim's mother and glaring at the victim as she approached had no legitimate purpose

and was aimed solely at harassing the victim." *Id.*

The Tennessee Court of Criminal Appeals agreed with the State, rejecting the defendant's argument. The *Thomas* Court observed that

> a rational trier of fact could have found that the Defendant's conduct did not serve the legitimate purpose of picking up her daughter from school but was instead calculated to harass, intimidate, and terrorize the victim. The State offered proof that other avenues were available to the Defendant to pick up her daughter from school, and the Defendant chose not to do so even though she was prohibited from "making contact" with the victim by an order of protection. The evidence established that the Defendant knowingly violated the order and that she used the specific pick-up location to carry out the offense of stalking. Therefore, the Defendant's conduct is not exempt from the harassment definition in the stalking statute.

*Id*. at \*15.

The "conduct that serves a *legitimate purpose*" exclusion from harassment under the Tennessee stalking statute traces to 2005. 2005 Pub. Acts, c. 482, § 1 (effective July 1, 2005). The meaning of the word "legitimate" as an adjective itself traces far deeper in history, reaching to the 1460s and remaining unchanged to the present. *See, e.g.,* Legitimate, Oxford English Dictionary, https://www.oed.com/dictionary/legitimate_adj?tab=meaning_and_use#39648449. "Legitimate" is defined as "[c]onforming to the law or to rules; sanctioned or authorized by law or right principles; lawful; proper." *Id*. The Eighth Edition of Black's Law Dictionary, the closest in temporal proximity to the adoption of the relevant statutory measure, defines legitimate in its adjective form, and in relevant part, as "1. Complying with the law; lawful <a legitimate business>. 2. Genuine; valid <a legitimate complaint>."

Unlike the factual circumstances in *Goldberg* and *Scott*, and in accordance with a dictionary understanding of the term, the trial court findings in this case reflect an understanding of Mr. Roach's actions as having been genuinely motivated by and serving the proper purpose of trying to protect Ms. Walters and the children and not to threaten or harass Mr. Negron. Given the sharply conflicting testimony of allegations and denials in the present case, it is apparent from the trial court's findings and reasoning that the trial court rejected much of Mr. Negron's testimony in favor of Mr. Roach's regarding Mr. Roach's actions in the present case. Many of the incidents referenced by Mr. Negron as stalking were entirely legitimate attendance at court proceedings involving Ms. Walters and the children either as to custody or in relation to sentencing for criminal actions committed against Ms. Walters and the children by Mr. Negron. Mr. Roach was clear that the safety of Ms. Walters and the children, as well as his general concerns for their care, was the purpose of his attendance, and there is no error in the trial court's conclusion that

- 13 -

Mr. Roach's attendance at these judicial proceedings was for a legitimate purpose.

Mr. Negron, however, raises concern about a limitless authorization for Mr. Roach to follow him as he pleases beyond the courthouse walls. This is not, however, our understanding of the trial court's decision. The trial court found a legitimate purpose for Mr. Roach in checking on Mr. Negron's location as to the relatively small number of occurrences in which Mr. Roach did so. The Circuit Court reached this conclusion based upon the context and circumstances of the present case, including the potential dangers posed by Mr. Negron based upon his past behavior as well as Mr. Roach's interests related to building a case regarding custody and visitation of the children. *Cf. Long*, 2022 WL 17875858, at *8 ("Thus, although surveillance by a third party private investigator could still be attributed to the defendant who hired the investigator, such surveillance is not illegal if it is for a legitimate purpose—such as preparation of a motion in a child custody proceeding showing that one's spouse is leaving the couple's minor children unattended for substantial periods of time."). The trial court did not find that Mr. Roach had a purpose to harass or intimidate. Instead, the trial court understood Mr. Roach's actions as serving the legitimate purpose of protecting Ms. Walters and the children and preparing for litigation with Mr. Negron over disputes related to the care, custody, and visitation with the children.

The determination of legitimate purpose can be a highly factually sensitive inquiry, requiring trial courts to delve deeply into the particular circumstances of a particular case. Based upon the record before us and the circumstances of the present case, we cannot find that the Circuit Court erred in reaching its conclusion that Mr. Roach's actions served a legitimate purpose. This court's decision should not, however, be understood to authorize Mr. Roach to seek out Mr. Negron and monitor his location and activities at Mr. Roach's whim. Such were not the circumstances of the present case, and our decision leaves unaddressed the legitimacy of such hypothetical conduct, as that was not actually addressed by the Circuit Court and is not before this court in this appeal.

VII.

Mr. Negron challenges the Circuit Court's award of attorney's fees and costs. He does not challenge the amount[1] but instead asserts that he did not knowingly make a false statement at the time he filed his petition, which he asserts is a necessary predicate for the imposition of attorney's fees in this context. *See* Tenn. Code Ann. § 36-3-617(a)(2).

Tennessee Code Annotated section 36-3-617 states in relevant part:

---

[1] "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed*, 301 S.W.3d at 615. Any argument that the trial court's attorney's fee award was wrongly calculated or excessive has been waived by Mr. Negron.

(a)(1) Notwithstanding any other law to the contrary, no domestic abuse victim, stalking victim, sexual assault victim, or victim of a felony offense under title 39, chapter 13, part 1, 2, 3, or 5 shall be required to bear the costs, including any court costs, filing fees, litigation taxes or any other costs associated with the filing, issuance, registration, service, dismissal or nonsuit, appeal or enforcement of an ex parte order of protection, order of protection, or a petition for either such order, whether issued inside or outside the state. If the court, after the hearing on the petition, issues or extends an order of protection, all court costs, filing fees, litigation taxes and attorney fees shall be assessed against the respondent.

(2) If the court does not issue or extend an order of protection, the court may assess all court costs, filing fees, litigation taxes and attorney fees against the petitioner if the court makes the following finding by clear and convincing evidence:

(A) The petitioner is not a domestic abuse victim, stalking victim, sexual assault victim, or victim of a felony offense under title 39, chapter 13, part 1, 2, 3, or 5 and that such determination is not based on the fact that the petitioner requested that the petition be dismissed, failed to attend the hearing or incorrectly filled out the petition; and

(B) The petitioner knew that the allegation of domestic abuse, stalking, sexual assault, or felony offense under title 39, chapter 13, part 1, 2, 3, or 5 was false at the time the petition was filed.

Tenn. Code Ann. § 36-3-617.

Mr. Negron's argument in opposition to the attorney's fees and costs award to Mr. Roach is essentially that his allegations as to physical and sexual abuse of the children by Mr. Roach were made after the filing of the petition and thus cannot be the basis for an award of attorney's fees and costs under Tennessee Code Annotated section 36-3-617(a)(2). His argument stems from the statutory language "at the time the petition was filed" in Tennessee Code Annotated section 36-3-617(a)(2)(B). In considering the award of attorney's fees and costs, we confine our analysis solely to considering the argument advanced by Mr. Negron. *See, e.g.*, *Sneed*, 301 S.W.3d at 615 (stating that "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her"); *Whitaker*, 32 S.W.3d at 227 (indicating that pro se litigants may not "shift the burden of litigating their case to the courts"); *Hessmer*, 138 S.W.3d at 903 (indicating that it is imperative that courts remain "mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary").

Even if we assume for purposes of argument that Mr. Negron is correct on this point,

- 15 -

his argument as to attorney's fees and costs is still ultimately unavailing. The Circuit Court made the express finding that "[b]y clear and convincing evidence, the award of attorney's fees in favor of the Respondent was proper under Tenn. Code Ann. § 36-3-617(2)(B) given the knowingly false allegations made against the Respondent by Petitioner *at the time of filing the petition*." (Emphasis added). The trial court's findings are supported by the record. Allegations related to Mr. Negron's children appear in Mr. Negron's protective order petition itself, as Mr. Negron asserted not only that he was a "stalking victim" but also that each of his three children were "stalking victim[s]" of Mr. Roach. *See* Tenn. Code Ann. § 36-3-601(12). The petition plainly states, "Andrew Roach has be[en] stalking me *& my children* for at least 3 years. He follows me when I have visitation & when I do not. He has made threatening gestures towards me *and my family*. I fear he will harm me, *my children*, & our animals. . . . He comes around me while I am with my children." (Emphasis added). In addition to alleging that he had been stalked, Mr. Negron's petition directly asserts that Mr. Roach stalked his children and made threatening gestures toward his children. Mr. Negron indicated that he feared that Mr. Roach would harm his children, and Mr. Negron sought with his petition a protective order for his children against Mr. Roach. The record provides clear and convincing evidence that Mr. Negron knew the stalking allegations against Mr. Roach as to the children were false at the time he filed the petition seeking a protective order against Mr. Roach as to the children.

Accordingly, even accepting for purposes of argument Mr. Negron's contention that his subsequent assertions of sexual and physical abuse against Mr. Roach were advanced too late to be considered in light of the "at the time the petition was filed" language, the Circuit Court made the necessary findings with regard to timing. The record provides support for the Circuit Court's conclusion. Therefore, we conclude that Mr. Negron's argument as to attorney's fees and costs is unavailing.

VIII.

Mr. Roach requests attorney's fees in relation to this appeal. The Tennessee Supreme Court has indicated that different standards may apply to appellants and appellees regarding waiver of attorney's fees on appeal. *Charles v. McQueen*, 693 S.W.3d 262, 283-84 (Tenn. 2024). The Tennessee Supreme Court ruled that "[w]hen a request for appellate attorney's fees does not seek relief from the judgment below, an appellee is not required to include the request in the statement of issues. But an appellee is required to present the request to the appellate court by raising it in the body of the brief, adequately developing the argument, and specifying that relief in the brief's conclusion." *Id*. at 284 (citations omitted).

In relation to attorney's fees on appeal, the appellee Mr. Roach includes as part of a section heading the declaration that "This Court Should Affirm the Trial Courts' Awards of Attorney's Fees and Award Mr. Roach Attorney's Fees for Having to Defend This Appeal." The entirety of Mr. Roach's argument regarding attorney's fees on appeal in

- 16 -

support of this proposition in his brief is set forth below:

> The Court should also award Mr. Roach the fees he has incurred in defending this appeal and remand the case to the circuit court to determine the appropriate amount of the fee award. *Cf. New v. Dumitrache*, 604 S.W.3d 1, 24 (Tenn. 2020); *Walker v. Pawlik*, No. M2013-00861-COA-R3-CV, 2013 WL 5781565, at *5 (Tenn. Ct. App. Oct. 23, 2013) (similar) (no perm. app. filed).

Mr. Roach does not further develop his contention that he is entitled to attorney's fees on appeal.

In both cases cited by Mr. Roach, Tennessee courts grappled with a request for attorney's fees on appeal presented by a litigant previously found to have been the victim of a prohibited act under the statute, such as stalking. *See, e.g., New*, 604 S.W.3d at 6 ("[A]fter a ten-hour hearing . . . the general sessions court issued an order of protection for Mother and the minor child prohibiting Father from having contact with them."); *Walker*, 2013 WL 5781565, at *1 ("Walker's petition alleged that Pawlik had stalked her. On January 17, 2013, the General Sessions Court granted Walker's Petition."). When those cases were appealed, the Tennessee Supreme Court and this court held that the purpose of the statute, *i.e.*, protecting victims of stalking and domestic violence by insulating them from having to pay costly attorney's fees, supported awarding attorney's fees and costs at the appellate level to litigants previously found to be victims of a prohibited act under the statute. *New*, 604 S.W.3d at 21-22; *Pawlik*, 2013 WL 5781565, at *5. The Tennessee Supreme Court indicated "that section 36-3-617 clearly authorizes awarding attorney's fees and costs incurred in obtaining an order of protection or the extension of an order of protection, or in defending an appeal involving the issuance or extension of an order of protection." *New*, 604 S.W.3d at 21-22.

The attorney's fees and costs award in the present case, though, is not pursuant to Tennessee Code Annotated section 36-3-617(a)(1) which provides, as noted above that

> Notwithstanding any other law to the contrary, no domestic abuse victim, stalking victim, sexual assault victim, or victim of a felony offense under title 39, chapter 13, part 1, 2, 3, or 5 shall be required to bear the costs, including any court costs, filing fees, litigation taxes or any other costs associated with the filing, issuance, registration, service, dismissal or nonsuit, appeal or enforcement of an ex parte order of protection, order of protection, or a petition for either such order, whether issued inside or outside the state. If the court, after the hearing on the petition, issues or extends an order of protection, all court costs, filing fees, litigation taxes and attorney fees shall be assessed against the respondent.

- 17 -

Tenn. Code Ann. § 36-3-617(a)(a). Instead, Mr. Roach attorney's fees on appeal would be under Tennessee Code Annotated section 36-3-617(a)(2), which provides, as noted above, that

> (2) If the court does not issue or extend an order of protection, the court may assess all court costs, filing fees, litigation taxes and attorney fees against the petitioner if the court makes the following finding by clear and convincing evidence:
>
> (A) The petitioner is not a domestic abuse victim, stalking victim, sexual assault victim, or victim of a felony offense under title 39, chapter 13, part 1, 2, 3, or 5 and that such determination is not based on the fact that the petitioner requested that the petition be dismissed, failed to attend the hearing or incorrectly filled out the petition; and
>
> (B) The petitioner knew that the allegation of domestic abuse, stalking, sexual assault, or felony offense under title 39, chapter 13, part 1, 2, 3, or 5 was false at the time the petition was filed.

Tenn. Code Ann. § 36-3-617(a)(2).

To prevail regarding his attorney's fees request on appeal, Mr. Roach needs an extension of the reach of the prior precedent upon which he relies. He has not advanced an argument in support of doing so. It is not the role of the court to develop this argument for him. *See Sneed*, 301 S.W.3d at 615 (stating that "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her"). We conclude that Mr. Roach has not adequately developed his argument for attorney's fees on appeal and find that his request for attorney's fees has, accordingly, been waived. *See Charles*, 693 S.W.3d at 284.

## IX.

For the aforementioned reasons, we affirm the judgment of the Circuit Court for Davidson County. We decline to award Mr. Roach attorney's fees in relation to this appeal. Costs of this appeal are taxed to the appellant, Brendan Todd Negron, for which execution may issue if necessary. The case is remanded for further proceedings consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE